**JORDAN DRILLING CO. et al. v. STARR.**

No. 4688.

Court of Civil Appeals of Texas.   El Paso.
Nov. 23, 1949.

Rehearing Granted March 1, 1950.

Rehearing Denied April 5, 1950.

L. D. Hawkins, Breckenridge, Sterling Williams, Snyder, Klapproth & Hamilton, Jeff Montgomery, all of Midland, for appellants.

W. P. Z. German, Jr., Stubbeman, McRae & Sealy, Walter C. Beardsley, all of Midland, for appellee.

McGILL, Justice.

Appellant Jordan Drilling Company, a partnership composed of Bryan Jordan and Walton Jordan, filed this suit against appellee J. W. Starr to recover on a contract or on quantum meruit for drilling an oil well located on a lease in Scurry County owned by Starr, to a depth of approximately 1584 feet; and also on quantum meruit for drilling out part of the cement which had solidified in a 7-inch casing which was run in the hole. Appellee filed a cross-action against appellant to recover his losses by reason of appellant's failure to complete the drilling contract. Trial to a jury resulted in answers to special issues submitted upon which the court rendered judgment denying appellant any relief and awarding appellee judgment against appellant on his cross-action in the sum of $4,400.00, appellee having remitted $100.00 of the amount of damages found by the jury. Appellant has duly perfected its appeal.

Thirteen points of error are presented. In the view we take of the case it will be necessary to discuss only four of them. The first point complains of the court's refusal to instruct the jury peremptorily in favor of appellant on its cause of action for drilling the well to a depth of 1584 feet at the contract rate of $2.75 per foot; the second of the court's refusal to instruct peremptorily in favor of appellant on its cause of action upon quantum meruit for the work done by it in attempting to drill through the cement in the 7-inch casing; the third and fourth of the court's failure to render judgment in favor of appellant

on such causes of action on the jury's verdict. We shall discuss these points together.

The following facts were established beyond issue: The contract under which the parties acted was in writing it having been prepared by Starr and accepted by Jordan Drilling Company as evidenced by the signature of "Jordan Drlg. Co., by Bryan Jordan". We shall hereafter refer to Jordan Drilling Company as "Jordan." There is a question whether the contract was ever signed by Starr, but there is no question but that he acted under it and is bound by it the same as though he had signed it. We reproduce the contract:

"Contract Made and Entered Into By and Between J. W. Starr and Jordan Drilling Company For Drilling On Sun Oil Company Farmout Located in Scurry County, Texas.

"1. Set 400' of 10¾ surface. Pipe and cementing to be furnished by J. W. Starr.

"2. If necessary, approximately 1200' of 8⅝ casing to be furnished, run and pulled at the risk and expense of Jordan Drilling Company. This pipe is to be mudded in by Halliburton at the expense of J. W. Starr.

"3. Seven inch oil string to be run at an undetermined depth above 1700'; hole not to be more than 3 degrees off vertical. J. W. Starr is to furnish pipe and cement.

"4. Six and one quarter hole to be made, drilling in to total depth of approximately 1700'.

"5. This agreement, with conscientious drilling efforts, is a two well contract if the first well justifies drilling the second. The second well to start at discretion of Starr, date should not be later than 14 August 1947.

"6. This contract is made at $2.75 per ft. to total depth. Day work to begin at time shot is run, at the rate of $150.00 per 24-hour day.

"Signed and dated this 22 day of July 1947.

"Accepted:

"Jordan Drlg Co

"Bryan Jordan."

Shortly after its acceptance of the contract Jordan entered upon the well site with its equipment and proceeded to drill. The 400' of 10¾ surface casing was set by Jordan and cemented by Halliburton Oil Well Cementing Company for Starr. We shall hereafter refer to the Halliburton Oil Well Cementing Company as "Halliburton". There is no controversy about this feature of the contract, nor about the second provision that Jordan if necessary should furnish, run and pull approximately 1200' of 8⅝ casing to be mudded in by Halliburton at the expense of Starr. When the drill had reached a depth of approximately 1584 ft. Howard Chamlee, who was a geologist and Starr's brother-in-law and his agent and representative to watch the progress of the well and check the formations, thought he had discovered a stain of oil and decided that the depth had been reached at which the 7 inch oil string should be run. The question then arose whether the hole was more than 3 degrees off vertical. Since appellant contends that it was entitled to a peremptory instruction for the 1584 ft. it drilled, at the contract price, because Starr waived its failure to drill to hole not more than 3 degrees off vertical as specified by the contract, we deem it necessary to reproduce Chamlee's testimony bearing on this question. He testified on direct examination: " * * * I asked Bryan if he had run any straight test and he said he didn't think so as he had run in a vertical a long time and had some good drillers there and I think he said 'he is carrying a straight hole,' but I insisted that we run some straight hole tests, which we did. He got some acid bottles out and a steel cylinder he had and we ran them inside the bailer. The first test we got out I don't think could be called a complete success but I do think it showed—now, I think it showed some evidence of the shape our hole was in, whether it was straight or not. You read them one a little business— don't know what it is called—you stick these bottles in a little sleeve and there are angles in there you can read from the etched lines on the bottle. There wasn't a finely etched line, but it was about a 32nd of

an inch wider than it should be. Consequently, you couldn't read down to the minute or degree of the angle. You could read within four or five degrees of what the deviation would be on it. We ran about six of these tests and these tests will show this hole was off anywhere from nine to fifteen degrees. So Mr. Jordan, both Bryan and 'Son' Jordan, explained to me. They said they had been using this bailer in another part of the field and there was some lodestone in there and in running the bailer it had become magnetized,—and they put a crowbar up there to show it had become magnetized,—and that they thought this was the cause of the deviation and they assured me that it could be one of the causes and they assured me every driller they had on the well was running tight, which means they were taking short strokes, which will not contribute to the hole deviation rather as if you were going down and taking long strokes. So they assured me they had drilled in this field for many years and they knew what they were doing and the drillers knew what they were doing, and from their experience in oil well drilling; this well could not be off more than three degrees. Bryan said, 'I bet it isn't off two and a half degrees.' They assured me it was a suitable hole to go ahead and complete. I told them I didn't know and wouldn't take the responsibility and was going to talk to Mr. Starr. I drove into Colorado City and called Starr on the telephone. I told Johnnie what had taken place and the result of the acid bottle test we had run and told him what Bryan and 'Son' had assured me, that they knew the hole was straight and it was suitable for running pipe and they didn't think it was off a degree or half a degree and they knew it was a straight hole and had to be a straight hole. Johnnie interrogated me extensively along that line and I said I had been assured by Bryan and 'Son' that the hole was straight * * *".

On cross-examination he testified:

"Q. You mentioned running six acid bottle tests. Was that all the same day? A. Yes.

"Q. Why did you run six the same day? A. Because the Jordan Drilling Company said they weren't satisfactory—the results we were getting weren't satisfactory and not a true condition.

"Q. It wasn't because the first five weren't dependable? A. Yes, they said they didn't show accurate results.

"Q. You weren't satisfied with what you found out? A. Yes.

"Q. Why did you stop at six? A. They ran out of bottles and acid.

"Q. Were you satisfied with the results of the sixth? A. At the time we quit when the sixth bottle came out of the hole, I wasn't satisfied. Subsequently, the conversation I had with Jordan and after they assured me—I was satisfied."
and

"Q. Is it true you reported to Starr, as you said, the acid bottles showed a material deviation of eight or nine degrees on the telephone and after that he told you to go ahead and set the casing, and you did that, that is true? A. Yes.

"Q. It is true he knew at the time he ordered the seven-inch casing set that the well might have been more than three degrees off vertical? A. That the well may have been?

"Q. Yes. A. Yes, that is true.

"Q. As a matter of fact, did you think it was more than three degrees off at that time? A. I didn't know, Judge Hawkins.

"Q. You didn't have any opinion, one way or the other? A. I had two opinions. Did you ever have two opinions—you think it could have been one way or the other?

"Q. You thought it could be three degrees or more? A. I thought it was and, no, sir, it could have been more than three degrees.

"Q. That was based on what you had seen from the acid bottle tests? A. Yes.

"Q. Isn't it true before you told Starr about the well you said to Roberts, 'It looks pretty crooked to me?' A. I don't remember saying it but could have.

"Q. As a matter of fact, it did look pretty crooked to you didn't it? A. After seeing the acid bottles, it did.

"Q. It looked to you it was more than three degrees off vertical? A. From the results of the acid bottles, yes."

After the 7 inch casing was run Halliburton proceeded to cement it. The written order for this work was signed "J. W. Starr, by Walton Jordan." Starr paid for the work. One hundred sacks of cement were mixed with water and put in the casing, and an attempt was made to force the mixture through the 7 inch casing and up into the hole around it by means of a plug inserted in the casing, to which water pressure was applied. When the plug had reached a depth of 250 to 300 feet in the casing it stuck, the pressure being lost, and Jordan, at the suggestion of Chamlee and Halliburton, used his drill to force the plug to a depth near the end of the casing, which had been pulled until it hung about 35 feet from the bottom of the hole. The cement on instructions of Chamlee, or with his approval, was permitted to set for 72 hours, after which it was discovered that from 500 ft. to 575 ft. of cement had solidified in the casing. Jordan proceeded to drill this cement out of the casing. Both Starr and Chamlee knew he was attempting to do so, and said nothing. After the drilling had continued for approximately 11¾ twenty-four hour days and from 150 to 400 feet of cement had been removed and much difficulty had been encountered in drilling it, Starr advised Jordan that he would not pay for such drilling and would not pay for any work done unless the hole was completed to 1700 feet, the contract depth. Thereupon Jordan abandoned the project.

A correct summary of the jury findings appears in appellant's brief, from which we copy:

"1. The well was more than 3 degrees off vertical.

"2. Starr did not know when he ordered the 7-inch casing run that the well was so off.

"3. Starr had notice when he ordered the 7-inch casing run that well may have been over 3 degrees off vertical.

"4. Defective condition of the 7-inch casing caused the cement to solidify in the casing.

"5. Chamlee did not refuse permission to Jordan to bail cement out of hole.

"6. Failure of Jordan Drilling Company to drill through the solidified cement was not due to defective 7-inch casing.

"7. Reasonable value of Jordan's work in trying to drill through solidified cement was $1500.00.

"8. Jordan Drilling Company did not fail to drill the well in a workmanlike manner.

"9. Failure of Jordan Drilling Co. to drill well in workmanlike manner did not cause failure to drill through solidified cement.

"10. The 7-inch casing was suitable for purpose intended.

"11. Jordan Drilling Co. accepted the 7-inch casing as suitable.

"12. Failure of Jordan Drilling Co. to drill through the solidified cement was not due to well being more than three degrees off vertical.

"13. Prior to running of 7-inch casing Walton Jordan assured Chamlee that well was not more than 3 degrees off vertical.

"14. Starr suffered damages by reason of Jordan Drilling Co. failing to complete well in sum of $4500.00."

As we see it, two controlling questions are presented, (1) Did appellee as a matter of law waive appellant's failure to drill the hole not more than 3 degrees off vertical, and (2) did appellant as a matter of law waive his excuse for failing to complete the well to the contract depth by attempting to drill the cement out of the casing? The answer to (2) depends on the answer to two other questions—namely (a) under the contract whose duty was it to cement the 7 inch casing (b) if it was Starr's duty, did the manner in which this was done by Halliburton resulting in from 500 to 575 feet of cement solidifying in the casing constitute a valid excuse for appellant's failure to complete the contract?

Since the jury found (3) that Starr had notice when he ordered the 7 inch casing run that the well may have been over 3 degrees off vertical, it is unnecessary to determine whether the uncontroverted evidence estab-

lished this fact. There is no contention that this finding is not supported by the evidence. The question is thus presented whether this finding established as a matter of law a waiver by Starr of the contractual requirement that the hole should not be more than 3° off vertical in view of the jury finding (1) that the well was more than 3° off vertical, and (2) that Starr did not know when he ordered the 7 inch run that the well was so off. We have concluded that the finding (3) did so establish such waiver by Starr. Walton Jordan testified: "Before we ran the seven-inch casing and during the discussion about these graduations on these bottles, I told Mr. Chamlee, 'Will you accept that hole as it is or do you want us to straighten it up or what do you want us to do about it?' and he said, 'I will call Mr. Starr and see if he will accept it as it is or not', and he left the rig and went to call Starr. That was some time on the afternoon tour and at about two or three o'clock next day, in the morning, he called me back and said 'Jordan, go ahead and run the pipe. The hole is OK and we will accept it', * * *."

This testimony is uncontroverted, as is Bryan Jordan's testimony to effect that after the pipe is run and cemented it is impossible to straighten the hole. Starr was called upon to decide whether he would accept the hole, knowing that it may have been more than 3° off vertical, or require it to be straightened. In other words, he was put to an election. He decided that he would accept the hole as it was. He thereby waived the requirement that it be not more than 3° off vertical. Authorities holding that while fraud prevents the running of the Statute of Limitations until it is discovered or by the exercise of reasonable diligence might have been discovered knowledge of facts that would cause a reasonably prudent person to make inquiry which if pursued would lead to a discovery of fraud is in law equivalent to knowledge of the fraud. Glenn v. Steele, Tex.Sup., 61 S.W.2d 810, and Ruebeck v. Hunt, 142 Tex. 167, 176 S.W.2d 738, 150 A.L.R. 775, are analogous. Starr's knowledge of the fact that the hole may have been more than 3° off vertical, if pursued, would have led

to the discovery that it was more than 3° off vertical as the jury found, in fact, the evidence shows that a test was taken about a month after the work had been abandoned which showed that the hole was 6° off vertical. Starr could not gamble that the hole was satisfactory for the purpose for which it was intended, and then when difficulties arose rely on a strict performance of the contract after Jordan had changed its position. In other words, he was estopped to set up as a defense the failure of Jordan to drill not more than 3° off vertical. See Caprito v. Grisham-Hunter Corp., Tex.Civ. App., 128 S.W.2d 149, loc. cit. 160 (18-19), Wr. Dis. Judg. Correct.

There is no ambiguity under paragraphs 1 and 2 of the contract as to whose duty it was to cement the 400 feet of 10¾ surface pipe or "mud in" the 1200 feet of 8⅝" pipe. Clearly, under the express terms of the contract, these duties devolved upon Starr. Paragraph 3 of the contract is silent as to who is to do the work of cementing the 7 inch oil string, the only provision being "J. W. Starr is to furnish pipe and cement." Under such circumstances, the interpretation given by the parties themselves as shown by their acts will be adopted by the court. Williston on Contracts, Vol. II, Sec. 623, p. 1206. The evidence is uncontroverted that Starr assumed the burden of cementing the 7 inch casing. Halliburton, an expert in this line, who in fact had a monopoly on this type of work because it was the owner of the patent on the plug used for this purpose, was employed to do the cementing, and its services were paid for by Starr. It is true that Jordan assisted in the work of breaking the sacks and mixing the cement, and used his equipment to force the plug through the casing after it had stuck, but this was done at the suggestion if not the direction of Halliburton and Chamlee; also it was Chamlee who decided that the cement should be permitted to stand for 72 hours. The responsibility for the cementing and the manner in which it was done as shown by the conduct of the contracting parties was therefore under the contract that of Starr. This being so, the question next arises whether under the contract Jordan was obligated to drill out

from 500 to 575 feet of cement after it had solidified in the casing, due to the cementing of the casing by Halliburton acting for Starr. The contract is silent as to any such onerous duty on the part of Jordan. Furthermore, there is evidence that it is customary to leave only from 25 to 30 feet and never more than 60 feet of cement in the casing, which could be drilled out in a matter of hours. If it can be implied that it was customary for the driller to drill this cement out without compensation and this custom can be written into the contract— a point we do not decide—yet there could be no implied obligation on the part of Jordan to drill out such a large quantity of cement. This is clearly deducible from the opinion in Smith Bros. Drilling Co. v. Klintworth, 195 Okl. 13, 155 P.2d 235. In that case more than 500 feet of cement solidified in the casing and the drilling contractor drilled it out and claimed $1,000 as compensation therefor. On conflicting evidence the court held that it was a jury question whether the drilling company had agreed to drill the cement out at its own expense. If it had been obligated to do so in the absence of agreement there could have been no such jury question. We therefore conclude that Jordan was under no obligation to drill out the cement in order to complete its contract; also that this obstacle placed in its way by Starr, through Halliburton, excused Jordan from completing the contract unless he waived such excuse, a question which we shall discuss presently. Mr. Summers, in his invaluable work on Oil & Gas, says: "If after the owner orders drilling stopped he takes charge of the well and damages it so that drilling cannot be continued, the driller is entitled to his compensation." Vol. 4, Summers Oil and Gas, Perm.Ed., § 685, page 93.

In support of the text he cites Miller v. Brosius, 113 Kan. 652, 216 P. 294, a case very similar to this case, the only substantial difference being that there the owner rendered further drilling to the contract depth impossible, while here he rendered it impossible unless Jordan drilled out the cement in the casing, a duty he was under no obligation to perform. Here, as there,

the owner stopped the drilling, and through Halliburton took charge of the well for the purpose of cementing the 7 inch casing. Interference by the owner with performance of the contract by the driller has been held to excuse performance in this State. Hahl v. Deutsch, 42 Tex.Civ.App. 1, 94 S.W. 443; Smith v. Patterson, Tex.Civ. App., 294 S.W. 984, Wr. Dis.

The more difficult question is whether Jordan, by attempting to drill the cement out of the casing, waived his excuse for failure to complete the contract. The general rule is thus stated by Mr. Williston: "The principle is general that wherever a contract not already fully performed on either side is continued in spite of a known excuse, the defense thereupon is lost and the injured party is himself liable if he subsequently fails to perform, unless the right to retain the excuse is not only asserted but assented to." Williston on Contracts, Vol. II, sec. 688, p. 1329; Garrett v. Dodson, Tex.Civ.App., 199 S.W. 675, loc. cit. 680, (8-10); where it was held that a building contractor who assented to an architect's requirement that he tear down and replace certain work because it did not conform to the plans and specifications, thereby waived his right to abandon it, even though the demand of the architect was arbitrary. It was intimated that the contractor may have been entitled to damages if the architect's action was in fact arbitrary. We have concluded that this general rule is inapplicable to the facts of this case. As above indicated, the drilling of 500 feet or more of cement out of the casing was not comprehended by the contract, therefore in drilling the cement Jordan was not continuing performance of the contract, but endeavoring to remove an obstacle so that it could continue the performance thereof. The rule above stated is applicable only where the party having a valid excuse for nonperformance continues performance of the contract. It has no application where the work done is not comprehended by the contract. Jordan was not put to an election of either standing on an excuse for failure to perform or waiving such excuse until the obstacle placed in its way by Starr which prevented the per-

formance had been removed. Jordan's attempt to remove such obstacle did not operate as an election. Starr's position was in no way changed by Jordan's action in attempting to drill out the cement. There is no element of estoppel. We therefore conclude that as a matter of law Jordan did not waive its excuse for its failure to complete the contract by attempting to drill the cement out of the casing. If we should be in error in this conclusion and a question of fact was presented as to whether Jordan by its conduct evidenced an intention to waive such excuse, and such fact if established would operate as a waiver, yet appellee requested no issue on this question and therefore waived any defense based thereon under Rule 279, Texas Rules of Civil Procedure.

It follows from what we have said that Jordan was entitled to judgment on the jury's verdict in view of the undisputed evidence. The only findings which we deem material are 3 and 7. Jordan having elected to sue on the contract could recover for the 1584 feet drilled by it at the contract price of $2.75 per foot. Hahl v. Deutsch, supra. The drilling of the cement not being comprehended by the contract, but having been done with the knowledge and acquiescence of Starr, Starr impliedly agreed to pay the reasonable value of such work, which the jury found was $1,500.00. The trial court should have so rendered judgment on the verdict, and that appellee take nothing on his cross-action. Therefore, the judgment of the trial court is reversed and under Rule 434, R.C.P., judgment is here rendered accordingly.

Reversed and rendered.

## On Motion for Rehearing.

PRICE, Chief Justice.

This is an appeal from a judgment of the district court of Midland County. Appellant Jordan Drilling Company, a partnership composed of Bryan Jordan and Walton Jordan, hereinafter called Jordans, sought recovery against appellee J. W. Starr, hereinafter called Starr, to recover on the contract for the drilling of an oil well located on a lease in Scurry County

owned by Starr. Starr filed a cross-action against Jordans, alleging their failure to comply with the contract and consequent damage to him. The trial was before the court and jury, submission on special issues, upon which the court rendered judgment denying Jordans any relief and awarding Starr judgment against them on his cross-action in the sum of $4,400.00. Jordans duly perfected this appeal.

On original hearing we reversed the judgment of the trial court and rendered judgment in favor of Jordans on the contract sued upon in the sum of approximately $4,400.00 and on quantum meruit asserted by the Jordans in the sum of $1,500.00, and reversed and rendered the judgment in favor of Starr on his cross-action. The case is before us on motion for rehearing by Starr. Upon careful consideration of the motion we are of the unanimous opinion that same should be granted in part, at least. The majority of the court is of the opinion that our original judgment should be reversed and the judgment of the trial court affirmed as to the action of the Jordans the judgment in favor of Starr on his cross-action reversed and here rendered in favor of the Jordans. Justice McGill is of the opinion that the motion should be overruled insofar as that part of our judgment for breach of the written contract, but set aside as to the judgment awarding Jordan recovery of the $1,500.00 on quantum meruit.

■ This action arose out of the following contract between the parties:

"Contract Made and Entered Into By and Between J. W. Starr and Jordan Drilling Company For Drilling on Sun Oil Company Farmout Located in Scurry County, Texas.

"1. Set 400' of 10¾ surface. Pipe and cementing to be furnished by J. W. Starr.

"2. If necessary, approximately 1200' of 8⅝ casing to be furnished, run and pulled at the risk and expense of Jordan Drilling Company. This pipe is to be mudded in by Halliburton at the expense of J. W. Starr.

"3. Seven inch oil string to be run at an undetermined depth above 1700'; hole not

to be more than 3 degrees off vertical. J. W. Starr is to furnish pipe and cement.

"4. Six and one quarter hole to be made, drilling in to total depth of approximately 1700'.

"5. This agreement, with conscientious drilling efforts, is a two well contract if the first well justifies drilling the second. The second well to start at discretion of Starr, date should not be later than 14 August 1947.

"6. This contract is made at $2.75 per ft. to total depth. Day work to begin at time shot is run, at the rate of $150.00 per 24-hour day.

"Signed and dated this 22 day of July 1947.

"Accepted:
"Jordan Drlg Co
"Bryan Jordan."

It will be observed same was not signed by Starr, but same was acted upon by all parties hereto and evidences the contract between them.

The Jordans filed suit against Starr alleging a breach of this contract. In substance they alleged that it was implied in and by said written contract at the time said contract was entered into it was mutually agreed and understood by and between the parties that the intent and effect of said contract was (a) that such well would be drilled to said depth unless oil and gas was discovered in paying quantities at a lesser depth (b) that the casing which defendant so agreed to furnish for the drilling of said well would be reasonably good casing and would be in reasonably good condition and suited for the purpose for which it was intended. They further allege that promptly after the execution of the contract plaintiff went about performing and did thereafter perform within the time and in the manner required by and under said contract all the duties, obligations and things required of plaintiff by and under same; that under and pursuant to said written contract it moved its tools and machinery to the location in question and drilled to a depth of about 1585 ft. at which depth a showing of oil was en-

countered; that Jordans thereafter ran the 7" casing furnished by the defendant; that the hole made by plaintiff was a 6½" hole and same was not more than 3° off vertical; that plaintiff performed all the duties resting upon it under such contract with due and reasonable diligence and in a workmanlike manner and with conscientious drilling efforts. It is then plead in the alternative if plaintiff be mistaken in his allegations to the effect that the well involved was not more than 3° off vertical then the said hole was only slightly more than 3° off vertical and it did not in any manner affect the drilling of the well or cause or contribute to solidifying the cement or the failure of plaintiff to complete said well; that if the well was more than 3° off vertical Starr had received information to that effect and that thereafter Starr without objection furnished all or a large part of the 7" oil casing to the extent but not of the quality required by the said written contract individually and by and through his said agents, employees and representatives without objection caused said casing to be run in said well and thereafter caused the cement to be run through said casing, which cement later solidified; he had notice that the well was more than 3° off vertical, that with this knowledge Starr caused the well to be cemented and the cement solidified inside said casing to the extent of some 530 ft. deep.

It is further averred that Starr in violation of his duty under the contract furnished Jordans well casing which was defective and wholly unsuitable for use; that the Jordans protested but Starr refused to furnish them any other casing and overruled plaintiffs' objections to using such defective casing.

It is further plead that after Starr, acting through Halliburton, had cemented the well and after the cement had solidified inside the casing to the extent of over 500 ft., at the special instance and request of defendant they sought to drill out the said cement and that such drilling was in addition to all drilling through cement which should have been done by plaintiff under said contract, had the cement been in the

proper place in said well; that the reasonable value of the work and effort so expended was the sum of $1,750.00.

Starr answered by a general denial, specially plead that if he be mistaken in denying that the oil string casing furnished by him under the contract referred to as 7" casing was defective, that the Jordans accepted said casing and with the exception of several joints thereof, indicated by Jordan, and that at Jordans' suggestion several joints of the casing were replaced by Starr; that Starr proceeded to make efforts to cement the well; that Jordans sought to drill out the cement left in the pipe after the cementing but after having worked and drilled for a period of approximately two weeks without expressing any dissatisfaction to Starr or indicating to him that the casing was unsatisfactory, ceased work and refused to abide by the contract. By counterclaim Starr sought to recover damages from the Jordans for alleged failure to comply with their contract. The court submitted special issues which are here reproduced with the jury's finding thereon:

"Special Issue No. 1. Do you find from a preponderance of the evidence that the well involved herein was not more than three degrees off vertical? Answer 'It was more than 3 degrees' or 'It was not more than 3 degrees'.

"Answer 'It was more than 3 degrees'.

"Special Issue No. 2. Do you find from a preponderance of the evidence that when the defendant J. W. Starr ordered the 7-inch casing ran in the well in question he knew that said well was more than three degrees off vertical, if it was more than three degrees off vertical? Answer 'He did' or 'He did not'.

"Answer 'He did not'.

"Special Issue No. 3. Do you find from a preponderance of the evidence that when the defendant J. W. Starr ordered the 7-inch casing run in the well in question, knowing that the well was not vertical, if he did so know, he had notice that said well may have been more than three degrees off vertical? Answer 'He did' or 'He did not'.

"Answer 'He did'.

"Special Issue No. 4. Do you find from a preponderance of the evidence that the defective condition of the 7-inch casing, if any, caused the cement to solidify in said casing? Answer 'It did' or 'It did not'.

"Answer 'It did'.

"Special Issue No. 5. Do you find from a preponderance of the evidence that Howard Chamlee refused permission to plaintiff Jordan Drilling Company to bail out the cement which later become solidified in the 7-inch casing? Answer 'He did' or 'He did not'.

"Answer 'He did not'.

"Special Issue No. 6. Do you find from a preponderance of the evidence that the failure of plaintiff Jordan Drilling Company to drill through the solidified cement, after the depth of about 1585 feet had been reached, was due to defective condition of the 7-inch casing, if any? Answer 'It was' or 'It was not'.

"Answer 'It was not'.

"Special Issue No. 7. What do you find from a preponderance of the evidence the work and use of equipment employed by the plaintiff Jordan Drilling Company in a reasonable attempt to drill through the solidified cement, if any, after the depth of about 1585 feet had been reached, reasonably was worth? Answer in dollars and cents, if any.

"Answer '1,500.00'.

"Special Issue No. 8. Do you find from a preponderance of the evidence that the plaintiff, Jordan Drilling Company, failed to drill said well in a workmanlike manner? Answer 'Yes, it did' or 'No, it did not'.

"Answer 'No, it did not'.

"By the term 'workmanlike manner', as used in this charge is meant work done in an ordinary skillful manner.

"Special Issue No. 9. Do you find from a preponderance of the evidence that the failure of plaintiff Jordan Drilling Company to drill said well in a workmanlike manner, if it did so fail, caused the plaintiff's failure to drill through the cement in the 7-inch casing? Answer 'It did' or 'It did not'.

"Special Issue No. 10. Do you find from a preponderance of the evidence that the 7-inch casing used in the well in question was suitable for the purpose for which it was intended to be used? Answer 'It was' or 'It was not'.

"Answer 'It was'.

"Special Issue No. 11. Do you find from a preponderance of the evidence that the plaintiff, Jordan Drilling Company, accepted as suitable, the 7-inch casing used in the well? Answer 'Yes' or 'No'.

"Answer 'Yes'.

"Special Issue No. 12. Do you find from a preponderance of the evidence that the failure of plaintiff, Jordan Drilling Company, to drill through the cement in the 7-inch casing in the well involved herein was due to the well being more than 3 degrees off vertical, if it was more than 3 degrees off vertical? Answer 'Yes' or 'No.'

"Answer 'No'.

"Special Issue No. 13. Do you find from a preponderance of the evidence that prior to the time the 7-inch casing was run Walton Jordan assured Howard Chamlee the well involved herein was not more than 3 degrees off vertical? Answer 'He did' or 'He did not'.

"Answer 'He did'.

"Special Issue No. 14. From a preponderance of the evidence, what amount of damages, if any, do you find the defendant suffered by reason of the plaintiff's failure to complete the well? Answer in dollars and cents, if any.

"Answer '$4,500.00'."

[redacted] Before seeking to apply the law to the facts established by the verdict or established by the undisputed evidence it is thought not inappropriate to discuss briefly a few well-established and elementary principles applicable to an action for breach of contract. In order for one to recover for a breach of a bi-lateral contract it is necessary he allege and prove his compliance therewith or a legal excuse for such failure to comply. 10 Tex.Jur. p. 396, par. 224, p. 499, par. 290. A legal excuse may arise by reason of waiver on the part of the other party or from the unjustifiable failure to comply with provisions binding on him. 10 Tex.Jur. p. 445, par. 259. In this case Jordans failed to have submitted as to whether or not they did comply with their contract. It was found that the well was more than 3° off vertical, which was not in conformity with their contract.

It is elementary, we think, in order for the Jordans to be entitled to recover they must have established that they complied with their part of the contract, or had a legal excuse for their failure so to do. It is their contention that Starr waived the provision that the well should not be more than 3° off vertical. This, it is contended was established by the verdict and by the undisputed evidence. Under the evidence when the hole was drilled to a depth of about 1584 feet Starr decided that the casing should be run. At this time tests were made to determine whether or not the hole was more than 3° off vertical. These tests were inconclusive; several were made and the material for making same gave out. Jordan insisted at all times that the well was not more than 3° off vertical. At the conclusion of these tests Starr ordered the pipe run, preparatory to the cementing of the well by Halliburton. A reference to the verdict will show that the jury found that when Starr ordered the casing run he did not know the well was more than 3° off vertical, that when he ordered the running of the 7" casing he had notice that the well might be more than 3° off vertical. It is the opinion of the majority that neither under these findings nor under the undisputed proof is waiver of this term of the contract established as a matter of law.

[redacted] Waiver is a voluntary relinquishment of a known right. It is a species of abandonment. By abandonment one may lose the title to personal property. By way of illustration, where one abandons the possession of personal property with the intention of never resuming the possession thereof he loses title thereto. In the case of either waiver or abandonment intention is a prime factor. By intention is meant acts, words or conduct manifesting an unequivocal intention to no longer assert a title or right. 10 Tex. Jur. p. 462, par. 268-

269; 12 Am.Jur. p. 918, par. 364; City of Wichita Falls v. Bruner, Tex.Civ.App., 191 S.W.2d 912, Wr. Ref.

Before Starr ordered the pipe to be run in the hole he was assured by Jordan that the hole was not more than 3° off vertical. It was Jordan's legal duty under the contract to furnish a hole with the pipe run not more than 3° off vertical. So far as this record goes Jordan knew, or should have known, at least as much as Starr in regard to the condition of the hole in this respect. It was Jordan's duty under the contract to see that the hole complied therewith, not Starr's. It is thought to be of the essence of waiver that an intention to abandon a right under the provisions of a contract must be unequivocally expressed, either by words or acts. The expression of this intention relied upon here, as we understand it, was after the inconclusive tests, ordering the pipe to be run. In view of Jordans' assurances to Starr it would seem not unreasonable on Starr's part to assume that Jordan intended to orally warrant his written obligation when he assured him that the hole complied with the contract. A mere suspicion does not amount to notice. 39 Am.Jur. p. 243, par. 17.

█ Jordan had no legal right under the contract to compel Starr to accept or reject the hole as complying with the contract before the 7″ casing was run. It is true Starr might voluntarily do this, might voluntarily waive this provision of the contract, but clearly he was under no obligation to accept or reject the work under the contract at the time it is claimed he did accept same.

█ At the time Jordan ran the pipe it was clearly his duty to know that the hole drilled was such as had been contracted for. In our opinion neither the findings or the undisputed evidence established as a matter of law a waiver of this provision. It may be that the evidence raises the issue as to waiver; if there is room for implied findings on the issue it must be taken that the trial court declined to make the findings, for its judgment was against Jordan.

However, if we be mistaken as to waiver, there is no contention there was a waiver as to the other portions of the contract. In this case it is clear that it was not within the contemplation of the parties that after the well had been cemented over 500 ft. of cement should solidify on the inside of the pipe. There was evidence, and it seems to be conceded by all parties, that in conducting an operation similar to the one in question it was contemplated that some forty or fifty feet of cement should solidify in the pipe, further that it was the duty of the driller to drill out this cement and continue drilling the hole to the depth desired.

It is found in the verdict that defective casing caused the cement to solidify. The same verdict found that the 7″ casing used in the well in question was suitable for the purpose for which it was intended to be used, further it was found that Jordan accepted as suitable the 7″ casing used in the well.

█ The contract provides that Starr should furnish the casing, further it seems to have been contemplated by the parties that new casing should not be used. Jordan did reject certain portions of the casing furnished by Starr; whether authorized by the contract or not he did exercise this authority. There is an element of conflict between the finding that the well failed to cement as contemplated by reason of defective casing, and that the casing furnished by Starr was reasonably well suited for the purpose intended. Jordan did have a duty to properly run this casing. It is thought that properly running the casing would imply seeing that there were no leaks in the sides of same so that the air could force the cement out of the lower end of the pipe so that same could solidify in the hole around the outside of the pipe. It may be that the two findings in question are conflicting, and one destroys the other. If the casing furnished was reasonably suitable, the defect therein might have been due to the improper running of same. But it is said that we have a finding that the Jordan Drilling Company drilled the well in a workmanlike manner. In truth the finding is that the jury refused to find from a preponderance of the evidence that Jordan failed to drill the well in a workmanlike manner. This is not a finding that Jordan

did drill the well in a workmanlike manner —in fact it is thought it was an attempt to submit an element of Starr's cross-action.

In order to recover it was incumbent upon Starr to show that they failed to drill according to the contract. There can be no question but that an implied term of the contract was that the well be drilled in a workmanlike manner. It is true that there is no finding that the cementing of the well was conducted in the usual and customary manner. There is no finding, however, that the cementing was done in an improper manner—in short, no finding that Jordan was prevented from performing the contract by any failure of Starr to comply with his duty under the contract. The evidence seems to indicate an unusual amount of cement was attempted to be forced down through the pipe. There is evidence, however, that in using used casing this was the proper and safer course.

If we eliminate the finding that defective casing caused the cement to solidify on account of the conflict with the finding that suitable casing was furnished, there is no finding as to why the well did not function under cementing as was undoubtedly contemplated by all the parties to the contract, no finding that the casing was properly run in the hole, no finding that the process of cementing the well was not properly conducted. If there was no defect in the manner of cementing, then some fault in the construction of the well must have been the cause of the solidification of the cement. Whether defaults of Starr in cementing caused the solidification or a failure of Jordan to properly prepare the well for cementing caused same were unfound issuable facts. If suitable when furnished the defect in the casing may have been caused by the manner in which the pipe or casing was inserted in the hole.

After the cement had been allowed to set Jordan commenced drilling on the hole, drilled some ten days or more. Beyond any question Starr knew that Jordan was drilling on the hole. When the drilling was resumed Jordan knew all the facts. If Starr had done unwarranted acts interfering with the performance, Jordan knew it

and under the circumstances had the right of election to continue the performance of his contract and recover thereon with damage for the unlawful interference. Vol. 2, Williston on Contracts, p. 139, Sec. 688; Universal Life & Accident Ins. Co. v. Shaw, 139 Tex. 434, 163 S.W.2d 376.

If he so elected the contract remained binding on the parties. Here Jordan elected to drill out the cement. Beyond any question he left the well in a worse condition than when he started to so drill. In case of such election the contract would have remained binding on him. After making such election he could not repudiate the contract and recover thereon.

Neither the verdict nor the undisputed facts justify or compel a judgment in favor of Jordans for the $2.75 per foot to the depth of 1584 feet. Our judgment on this item should be set aside. As to whether the judgment of the trial court in this respect should be set aside or affirmed depends upon the proper disposition of the other grounds of error urged by Jordan.

On the cause of action asserted by Jordan as to the extra drilling, our judgment reversing the judgment of the trial court is incorrect. It was incumbent upon Jordan to establish an implied contract on the part of Starr to pay for same. This issue was not submitted.

In regard to the judgment in favor of Starr on his cross-action the findings are insufficient to compel or justify same. Starr obtained no finding that he complied with the part of the contract required of him to cement the well. Beyond any question there was an implied obligation on his part under the contract to properly cement the well.

In their brief the Jordans urge that the court erred in admitting in evidence a certain measure line certificate of the Halliburton Oil Well Cement Company. After the Jordans ceased their work on the well Starr had the Halliburton company measure the well as to its angle of deflection from perpendicular. This test was made in the presence and under the direction of Chamlee, Starr's agent. One of the Jor-

dans was present. Halliburton's agent in making the test was a Mr. Poindexter. The ticket purports to be signed by Poindexter and Chamlee. It does not purport in terms to show the degree of deflection unless by some symbol. If it does show by some symbol the statement of evidence under the assignment of error fails to show same. Chamlee testified this angle was six degrees or over. The objection urged here and before the trial court was that the ticket was hearsay. If the court was in error in admitting this copy of the ticket we think it was harmless error. In the first place, the ticket does not seem to certify to anything. It could have had no possible relation to any other issues than No. 1. Special Issue No. 1, if answered in the affirmative attesting that the well was not more than 3° off vertical would not have shown a complete compliance with the contract on the part of the Jordans. Such an answer would not have compelled a finding in their favor. The assignment does not present reversible error.

What has heretofore been said covers in a general sort of way all other points urged by the Jordans herein. It is ordered that our judgment heretofore entered herein be in all things set aside; that the judgment by the trial court that the Jordans take nothing be in all things affirmed; that the judgment of the trial court in favor of J. W. Starr on his cross-action be reversed and judgment here rendered that as to said cross-action J. W. Starr take nothing as to the Jordans.

SUTTON, J., concurs.

McGILL, Justice (dissenting in part).

I adhere to the views expressed and to our disposition on original hearing insofar as we reversed the judgment of the trial court and rendered judgment for Jordan Drilling Company for the 1584 feet drilled by it at the contract price of $2.75 per foot and denied Starr any recovery on his cross-action. However, I have concluded that we were in error in reversing the trial court's judgment insofar as it denied Jordan any relief on its claim for drilling the cement out of the 7″ casing after the cement had solidified. Chamlee testified that after the cement had set 72 hours he got to the well about 9 o'clock; that Jordan had just gone into the hole with tools and had gotten to 1010 feet and found the top of the cement—"I couldn't imagine what had happened and about this time—it was ten o'clock. I don't know exactly what time it was—and 'Son' came driving up in his pickup and we talked about finding the cement where it was at 1010 feet and what could have happened and what they could have done wrong. Anyway, there it was, and he said 'It is nothing to worry about. Cement drills easy and we can drill it out in nothing flat—cement can be drilled 15 to 20 feet an hour and we will have no trouble with it,' and so I left it right there and came back to Midland. * * *"

This testimony was sufficient to raise an issue as to whether or not Jordan impliedly agreed to drill the cement out of the casing without compensation. In order to recover on its claim of quantum meruit for drilling the cement out of the casing in view of the testimony it was necessary that Jordan procure a jury finding that there was an implied contract whereby Starr impliedly agreed to pay for this work. He did not request any issue on this question and therefore waived any cause of action that he may have had based thereon. Therefore, it is my conclusion that the motion for rehearing should be granted in part and the trial court's judgment affirmed insofar as it denies Jordan any recovery on his quantum meruit claim for drilling the cement out of the casing, otherwise I adhere to our original disposition of this case.