**MOUND COMPANY, Appellant,**

v.

**The TEXAS COMPANY, Appellee.**

**No. 18910.**

United States Court of Appeals
Fifth Circuit.

Feb. 1, 1962.

Rehearing Denied March 27, 1962.

Leroy Jeffers, Lester Settegast, I. M. Wilford, Ross N. Sterling, Houston, Tex., Vinson, Elkins, Weems & Searls, Houston, Tex., of counsel, for appellant.

M. W. Parse, Jr., Leon Jaworski, William S. Clarke, Houston, Tex., Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Tex., of counsel, for appellee.

Before TUTTLE, Chief Judge, and HUTCHESON and RIVES, Circuit Judges.

TUTTLE, Chief Judge.

This is an action seeking to cause the termination of an oil and gas lease on 3,000 acres of Texas land. The lease was executed in 1915 and covered oil, gas and sulphur. The lease was amended in 1921 so as to provide for payment to Mound of "advance sulphur royalties" which escalated to $15,000 per month from and after July 1, 1924. The lessee, Texaco, Inc., in 1922 entered into a contract with Freeport Sulphur Company under which the latter would produce sulphur on a profit-sharing agreement. Under this agreement Freeport engaged in an active program of development and mining of sulphur at Hoskin's Mound, a salt dome located on the leased tract. In the course of this development it drilled some 1,000 sulphur wells and by 1955 it had exhausted the sulphur deposits. By this time Texaco had paid from its share of the sulphur production approximately $11,500,000.00 of sulphur royalties to appellant.

In 1942, in order to make provision for ending these obligations of Texaco to continue to pay the $15,000 monthly payments after the sulphur would be exhausted, an amendment to the lease was executed. It is conceded by both parties here that at this time Texaco had fully paid its advance royalties for some 40 years in the future—until 1985. This amendment is the document that must be interpreted to determine whether the appellant is entitled to a cancellation of the oil and gas rights in the lease. The only pertinent language is:

"ARTICLE II

"It is agreed that ARTICLE SECOND of said oil, gas and mineral lease from Mound Company to * * [Texaco] dated May 22, 1915, shall be amended to read hereafter as follows:

" '(a) On a date not later than that on which the lessee surrenders its right to mine sulphur from the Mound Company 3,000 acres and thereby is released from the obligation to make any further advance sulphur royalty payments, the lessee shall begin prospecting operations hereunder with respect to oil by putting at least one suitable drilling rig to work and shall continue such work with due diligence, in a bona fide effort to discover oil, until oil or gas is discovered in paying quantities on the Mound Company 3,000 acres or until the lessee shall have drilled to the depth herein stipulated. * * * At any time after drilling for oil has been started and before oil or gas is discovered in paying quantities on the Mound Company 3,000 acres, should the lessee permit more than thirty (30) days to elapse between the abandonment of one well and the commencement of operations for the drilling of another well, the lessor may at its option, unless such delay beyond thirty (30) days is caused by act of God or conditions wholly beyond the control of the lessee, terminate this lease, as to oil and gas, as to the Mound Company 3,000 acres.' "

Conceding that Texaco would not be required, under the terms of this amendment, to do anything in relation to prospecting for oil and gas until about 1986, and then only if it elected not to commence paying advance sulphur rentals again, Mound filed this suit claiming that it had elected to terminate the lease because Texaco had started "drilling for oil" and had thereafter (no production having been achieved) permitted more than 30 days to elapse without commencing "operations for the drilling of another well."

The conduct of the lessee, which Mound contends constituted "drilling for oil," and thus hastened by nearly 40 years the time when it must satisfy the 30-day clause, was the following:

By the latter part of 1949 the known sulphur deposits were being rapidly de-

pleted.[1] Freeport determined to attempt a refraction survey to ascertain, if possible, the shape and extent of the salt dome. As testified to by the Freeport Sulphur official whose responsibility it was, the following decision was made:

"Q. Would you tell the Court the story with respect to that particular well, how it came about that the well was located and who determined where it was to be located?

"A. At the time we drilled this well the mine was quite old. Most of the sulphur had been produced. We were very interested in continuing at Hoskins Mound and not overlooking some sulphur ore bodies. We hoped to find more sulphur on the edges of the dome where we hadn't previously drilled, or which were not completely explored.

"Since the dome sloped very steeply on the edges we were reluctant to drill in unknown areas for fear of missing the dome completely or being too high on the dome and not finding what we were looking for. So we decided to find out all we could about the shape of the dome by geophysical methods before we undertook to drill these edge wells, you might call them. So we conceived the idea of having a geophysical firm run a refraction seismograph test or tests on the dome and to do that we needed a well down into the salt, nearly in the center of the dome.

"So, with the advance of the geophysicists and our group, we chose this well location in the middle of the dome and arranged to drill into the salt and conduct our seismic program.

"Q. You said you together with a geophysicist determined the location?

"A. Yes.

"Q. Did the Texas Company have anything to do with determining the location of this Well No. 983?

"A. No."

When this decision was made, the appellee decided that it would be valuable for it to have this survey well drilled to about 7500 feet rather than stopping at 3500 feet, which would satisfy Freeport's needs. Thereupon, an agreement was made by the two companies by which Texaco was to receive all the data uncovered by the drilling to a depth of 3,500 feet, for which it would reimburse Freeport for one-half the cost and it would pay Freeport for the entire cost of drilling below the 3,500-foot level. It was not disputed that Texaco's objective in participating in this venture was to obtain information that might enable it to determine whether oil was present on the lease.[2]

As a result of the drilling of this well, Freeport determined to drill several wells on the flank of the salt dome as now outlined by the refraction survey. These were located and drilled by Freeport to see if it could locate additional sulphur deposits. Discussions with Texaco resulted in Texaco requesting and obtain-

1. The following description of the salt dome, taken from appellant's brief seems accurate:

"In a typical Gulf Coast piercement-type salt dome, such as Hoskins Mound, the salt core of matrix has penetrated the earth to a point near the surface. Piercement-type domes are so classified because oil production is generally around the flanks of the salt mass from strata or formations which have been pierced by the salt mass. On such domes, sulphur, if found, is discovered in the limestone caprock which is superimposed over the top of the salt."

2. The written agreement between the parties stated:

"The Texas Company (hereinafter called 'Texas') is desirous of securing all the information obtained by reason of the drilling of the aforesaid well and the aforesaid geophysical survey, and in addition, Texas desires to have the aforesaid well drilling to a total depth of 7500 feet so that additional geophysical work in connection with such well can be conducted, Texas being desirous of obtaining all such information in connection with the possibility of conducting prospecting for oil and gas at Hoskin's Mound."

ing permission to "acquire information from electrically logging and sidewall coring certain sulphur exploratory wells," which Freeport contemplated drilling. Texaco agreed to pay the cost of its logging and coring work and to reimburse Freeport for "delay rig time" caused by this work. Otherwise Freeport did the drilling at its expense. Nine of these wells were drilled by Freeport and they were electrically logged and corings were taken for the account of Texaco. This work was completed in November, 1950. Thereafter no drilling for oil or gas has been undertaken and there has been no production of oil or gas.

Mound contends that in two of the nine wells oil was discovered in paying quantities and that the failure of Texaco to produce worked a termination of the lease; in the alternative, Mound contends that the foregoing activities of Texaco amounted to "drilling for oil" within the language of the amendment which required that thereafter such drilling must continue with due diligence until discovery of oil or gas in paying quantities and without more than 30 days delay from abandonment of one dry hole until commencement of operations for the drilling of a new well.

The trial court held against the appellant on both issues. We affirm the judgment of the trial court.

▇ The appellant's principal argument here is that on the uncontroverted facts, set out in skeleton form above, the trial court could not find either as a fact or as a conclusion from the facts that the appellee did not "start drilling for oil." It takes the position that the participation of Texaco in drilling the initial well in the center of the salt mound to attempt to ascertain its exact shape and extent, followed by the participation of Texaco in what was carried on by way of logging and core testing the nine peripheral wells, indisputably an aid to determining the likely presence of oil and gas, constituted "drilling for oil" in the sense that when this was done this triggered the drilling clause of the lease, and Texaco must

thereafter drill continuously until production was achieved.

We think, as did the trial court, that the lease can not be given such a construction.

▇ In construing the lease, we must bear in mind that what we are to do is to determine from its language what was the intention of the parties. We must also bear in mind that if its language is reasonably susceptible of a construction, argued for by one of the parties, that prevents a forfeiture, such construction is to be preferred to one resulting in a forfeiture. Ryan v. Kent, 36 S. W.2d 1007 (Tex.Com.App.). See also Decker v. Kirlicks, 110 Tex. 90, 216 S.W. 385 (Tex.Sup.Ct.), and West v. Continental Oil Co., D.C., 91 F.Supp. 505, aff'd. (5 Cir.) 194 F.2d 869.

Here we start with the highly significant fact that for some 37 years the lessee would not be required, under the lease, to do *anything* relating to "prospecting" for oil. The next thing we must note is that both parties agree that the term "drilling for oil" is to be equated with the prior language which sets up the requirements which, in about the year 1986, the lessee must satisfy to prevent termination of the lease. These requirements are: "The lessee shall begin prospecting operations hereunder with respect to oil by putting at least one suitable drilling rig to work and shall continue such work *with due diligence, in a bona fide effort to discover oil * * *"* (Emphasis added.)

In construing the requirements of prospecting and drilling for oil, imposed upon the lessee to keep the lease alive after a certain date, we must bear in mind that the parties here are assuming postures contrary to what would normally be to their interests to take. The requirements contained in Part II of the 1942 Amendment are designed as requirements that the lessee must satisfy or it will lose its lease. Ordinarily, of course, if the lessee performed any act touching on prospecting or drilling, it would be urging that such acts fully discharged these require-

ments. The lessor on the other hand, would normally be urging on the court that the lessee's actions failed to measure up to the specific requirements of the lease. Here the positions of the parties are reversed. The lessee is taking the position that what it has done touching on exploration and/or drilling does not measure up to what it would be required to do in order to keep the lease alive, whereas the lessor is insisting that what the lessee has done would fully satisfy the requirements imposed on the lessee to prevent termination.

■■ However we consider the language that must be construed, we find that what the lessee would be required to do to keep the lease alive was something fairly specific: (1) Begin prospecting operations by (2) putting at least one suitable drilling rig to work, and (3) continue to work with due diligence (4) in a bona fide effort to discover oil. Clearly unless all these specific requirements were met then, under the concessions here before the Court, the lessee did not "start drilling for oil." [3] It makes no difference that the good faith of the effort to discover oil may be a somewhat subjective test. That is what the parties agreed to and thus it is what they are bound by. This is not to say that the only evidence of whether there was a good faith effort to discover oil was the testimony of those making the decisions. It is to say, however, that their testimony as to the purpose of doing the admitted acts and their intent in undertaking them was admissible, and, moreover, it became a question of fact whether there was such good faith effort intended and carried out.

Clearly there are areas of activity that may be carried out by a lessee to gather information bearing on the likelihood that oil might be found on the lease that appellant could not conceivably contend satisfied the "drilling for oil" requirement. When the two minerals, sulphur

and oil, have been separated and different requirements are agreed to as to the two, then obviously, if the lessee performs activities that are ambiguous in nature, i. e., such as would be permissible as to sulphur, and without effect on oil drilling obligations if carried on under the sulphur lease, but which would be of utmost significance if carried on under the oil drilling terms of the lease, then the purpose and intent of the party performing these ambiguous acts must be determined.

Here, all the oral testimony by the parties who made the decisions to drill the exploratory well and the nine peripheral wells, was to the effect that these wells were decided upon without prior consultation with and without *requiring* any cooperation from Texaco. The testimony was undisputed that Freeport Sulphur Company would have performed substantially all of these acts whether or not Texaco joined in and shared some of the expenses. Thus it is that appellant's proposition is reduced to the argument that since what Texaco participated in by deepening the center well and by logging and core testing the nine other wells drilled for sulphur exploration was what a lessee drilling for oil would also do, then this activity by Texaco *as a matter of law* must be accounted as drilling for oil.

On the other hand, there was ample testimony tendered by the appellee to the effect that what it did in obtaining this kind of information from all available sources was what the owner of an oil lease would do, *preliminary* to drilling for oil.

Bearing in mind that under the contract appellee would not have to do anything relating to prospecting for oil until the year 1986, and bearing in mind that the lessor, as well as the lessee, could not possibly be injured but both would be positively benefitted by any fact finding surveys the lessee was willing to make at its expense and with no obligation to do so, short of "drilling in a bona fide effort

---

**3.** This requirement being a condition precedent to creation of the obligation for continuous drilling, it must be strictly complied with. See Gulf Pipe-Line Co. v. Nearen, 135 Tex. 50, 138 S.W.2d 1065.

910

to discover oil," we are fully convinced that the trial court could find that the contract required something more than was actually done here to trigger the 30-day clause. We also conclude that the trial court could find as a fact that the lessee did not intend to start on a bona fide effort to discover oil. In this connection we use the term "bona fide effort" as meaning the kind of effort that lessee in 1986 would be called upon to exert to keep the oil lease in effect.

We can not believe that if Texaco were here offering such actions as it here performed, i. e., riding at least partially free on drilling done for the purpose of discovering additional sulphur deposits in wells placed appropriately for sulphur discoveries and logging and core testing such sulphur wells, the appellant would agree that this constituted a full performance of its obligation to drill with due diligence in a bona fide effort to discover oil so as to keep the lease alive. Moreover, we do not believe a Texas Court would hold that such activities would satisfy such requirement. Much less should a court find this to be so where a forfeiture of the oil lease is sought on the basis of such a finding.

█ In concluding that the ambiguous actions taken by Freeport and Texaco are subject to explanation by the parties who made the decisions, we do not overlook the proposition asserted by appellant that when subjective intent must be determined as a fact, all facts and circumstances must be looked to to enable the fact finder to make this determination and not just the secretly held purpose or intent of the actor. Stitz v. National Producing & Refining Co., Tex.Civ.App., 247 S.W. 657; Jordan Drilling Co. v. Starr, Tex.Civ.App., 232 S.W.2d 149. Certainly, however, where conduct is ambiguous as here there is no rule of law that excludes the testimony of the actor touching on the question: which purpose or intent did he have in performing the specified acts?

█ We next come to the second argument of appellant that in two of the peripheral wells oil in paying quantities was actually discovered; and that failure to *produce* such oil automatically terminated the separate lease on 2500 of the 3000 acres. The nature of the proof that there was actual discovery was opinion testimony of experts based on an analysis of the electrical logs and the cores taken from two of the wells. The trial court considered the opinions that there was oil in paying quantities too speculative for it to accept in light of expert testimony from other witnesses that it would be impossible to conclude with any degree of certainty that such quantities were present on the basis of the hypothetical questions presented. It is clear that the trial court felt that the inability of the witnesses to estimate probable production in number of barrels greatly weakened their testimony. Appellee cites the Texas case of Union Sulphur Co. v. Texas Gulf Sulphur Co., Tex.Civ.App., 42 S.W. 2d 182, as supporting the trial court's view that only actual production could prove the existence of minerals in paying quantities. While we do not feel prepared to conclude that the Texas courts have gone this far, it is nevertheless true that the weight to be given to opinion evidence is a matter for the trial court's determination. The trial court is not bound by the opinion evidence of experts even when uncontradicted New York Life Insurance Co. v. Johnston, 5 Cir., 256 F. 2d 115; Western Canada Steamship Co. v. United States, 9 Cir., 245 F.2d 921; Arena Co. v. Minneapolis Gas Co., 8 Cir., 234 F.2d 451. Moreover, here there was opinion evidence to support the trial court's finding that the appellant had failed to carry its burden of proving discovery in paying quantities.

We conclude that the judgment of the trial court was amply supported in fact and law. It is, therefore,

Affirmed.

RIVES, Circuit Judge (dissenting).

Both parties agree that the 1942 amendment defines "drilling for oil" in terms of prospecting for oil with a suitable drilling rig in a bona fide effort to

discover oil. With that definition in mind, it seems to me that the undisputed evidence established that drilling for oil was started. Texaco contends that no oil or gas in paying quantities was discovered and I would agree with the finding of the district court to that effect. Nonetheless, when Texaco permitted more than 30 days to elapse between the abandonment of one well and the commencement of operations for the drilling of another well, Mound Company had an option to terminate the lease as to oil and gas. If the option existed, it was unquestionably exercised. The clear duty of the Court is to hold the parties to the terms of the agreement which they executed. With deference to the district court and to my brothers, the case appears that simple to me.

I therefore respectfully dissent.

Rehearing denied; RIVES, Circuit Judge, dissenting.