## OKLAHOMA TIRE & SUPPLY CO. v. WILLIAMS et al.

No. 14046.

United States Court of Appeals
Eighth Circuit.

May 1, 1950.

Edward L. Wright and Edward Lester, Little Rock, Ark. (Wright, Harrison, Lindsey & Upton, Little Rock, Ark. on the brief) for appellant.

Henry Donham, Little Rock, Ark., and C. Floyd Huff, Jr., Hot Springs, Ark., (William H. Donham, and Donham, Fulk & Mehaffy, Little Rock, Ark. on the brief) for appellees.

Before SANBORN, WOODROUGH, and THOMAS, Circuit Judges.

WOODROUGH, Circuit Judge.

The judgment here appealed from awarded recovery to each of the several plaintiffs in the action for damages occasioned to them respectively by a fire which injured one of the plaintiffs bodily and destroyed property of the others. The fire was started during the cooking of family dinner by flames coming out of the oven of the oil cook stove in which biscuits were being baked. The flames went forward when the oven door was opened and injured the plaintiff who was attending to the cooking, and backward through vents in the oven to the wallpaper right behind the stove, and circled the ceiling of the kitchen and spread to the rest of the dwelling house and to an adjacent barn, and destroyed both. It also destroyed the stove. The plaintiff, Thomas F. Redick, bought the stove on March 8, 1948, at defendant's retail store in Hot Springs, Arkansas, and the members of his family used it for cooking the family meals continuously for eight months and twenty seven days and were so using it throughout the morning when the fire occurred on December 5, 1948. The action was against the defendant as seller of the stove and was predicated on the charge that the stove was defective when sold and that defendant was negligent in failing to inspect, discover and remedy the defects or advise plaintiffs thereof, and that the defects caused the emission of the flames from the oven of the stove and the consequent damages to the person and to the property of the respective plaintiffs. On the trial of the case to the court without a jury it was the theory of the plaintiffs, as stated by the trial court, "that the fire was caused by a leak on or near a burner of the oven compartment of the stove" and the court found "that defendant sold the plaintiffs [Mr. and Mrs. Redick] a kerosene stove that was dangerously defective," "that it would have been impossible for the fire to have occurred as it did if a leak had not existed and if the kerosene had not escaped through such leak." It also found that "a careful inspection of the burner by a competent inspector would have disclosed the location and extent of the leak and the cause thereof." It concluded that defendant as a dealer was guilty of negligence which was the proximate cause of plaintiffs' damage, and failed to exercise the ordinary care of a reasonably competent and prudent dealer in that it failed to conduct reasonably effective inspections and failed to correct the defective and dangerous condition of the stove or to apprise the plaintiffs thereof. The written opinion of the court, including the order for the judgment which was entered, is reported at 85 F.Supp. 260.

On its appeal to this court the seller of the stove contends that there was no substantial evidence that there was a leak in the stove which was the proximate cause of the damages to the plaintiffs and the judgment against it was therefore erroneous.

## Opinion.

It appears undisputed that the stove in question in this case was manufactured by and bore the identifying name of Perfection Stove Company, a reputable manufacturer of kerosene stoves sold throughout the country for more than sixty years. Model 888 bought by Mr. Redick was brought out in 1939 and 158,000 of them had been sold at the end of 1948. They have three separate burners for cooking on the top of the stove at the left side and two burners set below the oven on the right side, all alike, and of the long chimney wick type of which Perfection has made and

sold 13,762,664 in the last twenty five years. Model 888 carries the approval label of Underwriters Laboratories of the National Board of Fire Underwriters, meaning that the model was submitted to and tested and approved by that institution, and it was shown that each stove as it was manufactured was tested at the factory for leaks by subjecting the full line assemblies to air pressure and immersing them in water, and after being fully assembled fuel was put in and each stove was lit and allowed to burn and was again checked to make sure against leaks.

The stove in question was shipped from the warehouse of Perfection Stove Company in Kansas City directly to defendant's store in Hot Springs in a crate with the burners fastened in position by wires attached to the stove. Defendant removed it from the crate and placed it on exhibition for sale in its store window. There was no evidence that it had suffered any mishandling or damage of any kind in transportation or uncrating. The plaintiffs, Mr. Redick and his wife, had seen a similar type stove in a friend's home and had examined such a stove in a store in Conway, Arkansas, and noticing the one in defendant's show window, Mr. Redick told defendant's salesman that he was interested in a Perfection oil stove and from that approach Mr. Redick proceeded to buy it from defendant.

He took it from the store to his home himself, and set it in place in his kitchen, removed the wires with which the burners were held in their position and as stated, members of his family did all the household cooking with it continuously for nearly nine months until the fire occurred.

The burners for the top of the stove never gave any trouble. Their position in the stove was such that the cook standing on the floor could readily see the condition and position of the wicks and the color of the flame which showed whether the burners were working properly or not and could move the wick up or down by turning the hand wheel without stooping over. But the burners for the oven were mounted at the bottom of the stove on a sliding metal member adapted to hold them in proper position which member was drawn forward over an opened lower door when the burners were being lighted or cleaned or refueled and pushed back under the oven when in operation. Located in that position, although the lower door was left open, they were not as conveniently observable by the cook as were the top burners. The hand wheels were extended to within her reach as she stooped over a little but decided stooping was required to watch the flame.

Accordingly, as detailed in the opinion of the trial court, the ladies of Mr. Redick's family who did the cooking with the stove suffered annoyances and made complaints to the defendant about the working of the oven burners. One or the other or both of said burners (the witnesses did not specify) smoked and emitted fumes, soot and smoke into the kitchen and at times flames flared up in the area below the oven. But adjustment of the wick of the offending burner or burners by turning the wick's hand wheel never failed to eliminate the improper combustion and to restore proper operation of the burners at any time during the nearly nine months' daily operation and until the occurrence of the fire. There was no instance in which the smoking, sooting, or flaming from the oven burners caused the cook to cease or desist from her cooking. She would merely adjust the wick and restore proper burning and so accomplished all the family cooking with the stove.

The day in and day out work of cooking required the cook to watch the whole oven part of the stove to keep it clean; to observe the burner wicks closely to maintain them in proper condition and to put in new ones as needed; to add fuel when it ran low; to move the sliding member in which the oven burners were embedded to proper position back under the oven and to move it forward out of the oven; to take hold of the burner and tilt the chimney parts back to expose the wick; to trim or even up the wick; to light the wick and move the upper burner parts back in position; to closely watch the changing flame and regulate it with the hand wheel and when the time came, to turn the wick down and in that way put out the burner.

Mr. Redick's wife and daughter, Mrs. Humphrey, both plaintiffs in the action, testified in detail as to their use of the stove for the family cooking and their constant observation and handling of the oven parts over the whole period of nearly nine months and their understanding of and familiarity with all the aspects of the stove and its operation. That there was no leak in the ordinary sense of a discharge that poured or dipped from the container or a conduit or joint was clearly shown and is conceded or assumed by the parties and by the court in its opinion. The defendant's salesman and also a representative of the manufacturer of the stove made trips from the town and to plaintiff's place and examined the stove for leaks in the presence of the plaintiff ladies and there were none. When the wicks were adjusted with the hand wheels the stove burned properly.

But plaintiffs showed by witnesses who worked at the trade of repairing stoves and who testified as experts that oil burning cook stoves are subject to having minute leaks at the joints of the conduits or along the stems of the wick hand wheels and that the amount of kerosene coming from such leaks might be insufficient to manifest itself in a stream or even in dripping. In that case they said the kerosene from such a leak would "crawl all over the burner." They also said that when the burners were in operation such accumulations of oil upon the stove parts may become heated and may ignite in flame which would pass up through and out of the oven of the stove. The claim in this case that the stove leaked which was sustained by the court was that the stove had that kind of a leak or leaks.

■ But our study of the record has not disclosed any substantial evidence to show that there was such a leak. The court rightly declared that the case was not one in which the alleged negligence of the defendant, i. e., sale of a defective leaking stove, could be inferred from the occurrence of the fire. The stove was long in the sole possession and use of the plaintiffs and the doctrine of res ipsa loquitur was not applicable or sought to be invoked. The

court rightly recognized that the burden of proof was on the plaintiffs to establish the charge that the stove leaked by evidence. The non expert witnesses they called showed by their testimony that they were in position to know whether or not it leaked because they were in closest contact with it and handled and watched the parts every day, day in and day out for nearly nine months. There was no suggestion in the testimony of the experts that when kerosene is exuded through minute leaks and crawls over and accumulates on stove parts, the nature of the kerosene changes in any way. It remains the same very palpable substance with the same quality of obtruding itself upon the senses of sight, touch and smell. The only reasonable inference from the testimony of the ladies of Mr. Redick's household and their description of their care and use of the stove over the long period they had it, is that they never saw, or felt or smelled any leaked oil about the stove. In making complaints about the stove to defendant they gave descriptions of their experience with it and leaking was no part of it. The finding that the stove leaked was in no way rested on any statement of the ladies or the salesmen who were in position to know.

The three expert witnesses called for plaintiffs never saw the stove, and we think that the most favorable inference for the plaintiffs that can be drawn from their extended testimony is that they were of opinion that if kerosene leaked and accumulated upon or near a burner of the oven compartment of the stove as found by the court, igniting thereof would result in the operation of the oven part of the stove and would account for the happening of the fire. It was also their opinion that it would account for certain instances in which there had been some flaring up in that compartment prior to the fire. That opinion was opposed and contradicted by the testimony of defendant's very highly qualified expert engineer in charge of design and construction for the largest manufacturer of kerosene cooking stoves in the United States who thought that kerosene leaks could not have caused the fire, even if there had been such leaks. As the burners are constructed

the influx of air about the parts below the flame keeps the parts cool. He thought that only a contamination of the kerosene in the stove with some more volatile substance could account for what happened. A number of theories may be conjectured.

But in the circumstances of this case the primary question for determination by the court as to whether or not this stove leaked and whether or not there were accumulated kerosene deposits on or about the parts depended entirely on common knowledge and common understanding. If it leaked the presence of the exuded kerosene on and about the stove parts became as manifest to any one who looked at them as the presence of the parts themselves. It would leak and the exudation would accumulate by night as well as by day and at the time of the fire that would have gone on night and day for nearly nine months. Whether it did or not was open to the common knowledge and common understanding of those who tended and used it and inspected it, and the mere opinion of stove repair men who never saw it could not and did not afford any proof that it leaked. The emission of flame from the oven and the happening of the fire were equivocal events even if the stove leaked, and if there had been proof that it leaked expert opinion would have been competent as to whether the leak contributed to or caused the happening. But the fact of leaking of smelly, smeary, oil kerosene "crawling all over the burners" was not a matter of opinion. The only fair inference from the testimony of the ladies who tended and used the stove and handled the parts daily throughout the months is that there were no such leaks and the testimony of defendant's salesman and the manufacturer's representative was directly to that effect.

We think the trial court erred in disregarding the testimony of the ladies of the Redick family and that of defendant's salesman and the manufacturer's representative, affording as it did convincing proof that the stove did not leak, and in resting its finding that it did leak upon the non probative opinion of the expert stove repair men. Entirely absent any proof of the fact

readily observable to any layman that the stove leaked, the opinion of the experts that such a leak caused the emission of flames and the conflagration was merely speculative and conjectural and without probative value. See Massachusetts Protective Association, Inc. v. Mouber, 8 Cir., 110 F. 2d 203, 206, and cases cited; Wesson v. United States, 8 Cir., 172 F.2d 931, 933, and cases cited.

The law applicable to the case was the law of Arkansas, but consideration of the Arkansas cases relied on by the court and cited to us fully confirm the law of that state to be, as stated by the trial court, that a finding can not be predicated upon conjecture and speculation and that inferences to support a finding must arise out of facts established by evidence. Here the fact to be established was that the stove leaked and all the witnesses in position to know the truth of it refuted it.

As there was no proof that the stove leaked we hold the finding that it did to be erroneous.

Reversed with direction to dismiss.