The ARENA COMPANY, a Minnesota Corporation, and Hardware Mutual Insurance Company of Minnesota, a Minnesota Corporation, Appellants,

v.

MINNEAPOLIS GAS COMPANY, a Delaware Corporation, Appellee.

A. A. BENNETT, Inc., a Minnesota Corporation, Northwestern Fire & Marine Insurance Company, a Minnesota Corporation, Badger Mutual Insurance Company, a Wisconsin Corporation, Underwriters Insurance Company, an Illinois Corporation, and General Insurance Company of America, a Washington Corporation, Appellants,

v.

MINNEAPOLIS GAS COMPANY, a Delaware Corporation, Appellee.

Nos. 15418, 15419.

United States Court of Appeals Eighth Circuit.

June 13, 1956.

See also 227 F.2d 665.

E. A. Danforth, Minneapolis, Minn. (F. W. Thomas, Youngquist, Furber, Comaford, Danforth & Clarkson, and Dorsey, Colman, Barker, Scott & Bar-

ber, Minneapolis, Minn., were with him on the brief), for appellants.

George C. Mastor, Minneapolis, Minn. (Chester L. Nichols, and Nichols, Mullin, Farnand & Lee, Minneapolis, Minn., were with him on the brief), for appellee.

Before GARDNER, Chief Judge and JOHNSEN and VOGEL, Circuit Judges.

VOGEL, Circuit Judge.

Appellants brought these actions in the United States District Court for the District of Minnesota against appellee to recover damages for the loss resulting from a fire that occurred on the evening of January 13, 1950, and partially destroyed a commercial building and contents in Minneapolis, Minnesota.

In No. 15,418 appellant Arena sought to recover the uninsured portion of its loss as owner of the building. Hardware Mutual Insurance Company of Minnesota sued as subrogee of its insured, Arena. In No. 15,419 appellant A. A. Bennett, Inc., sought to recover the uninsured portion of the loss sustained by it as lessee of the building and owner of the furnishings, etc., therein. The four insurance companies named sued as subrogees under Bennett, Inc.

The cases were consolidated for trial and were tried without a jury, judgment being for the defendant in each action. Jurisdiction is based on diversity of citizenship and the requisite amount. To avoid confusion, the parties will be designated as they were in the court below.

Plaintiffs contended, as their cause of action, that defendant was negligent in putting into operation, by lighting at the beginning of the heating season and supplying gas, one of four gas heaters (referred to as unit heater No. 1) in the building, knowing that the heater was dangerously close to combustible material, failing to warn plaintiffs of the danger, and representing to plaintiff Bennett, Inc., that it was safe to operate.

Defendant denied liability generally and contended that the fire was not caused by heat radiated from heater No. 1; that it owed no legal duty to plaintiffs; made no representations to them as to the safety of the location of heater No. 1; that if such representations were made, they were unauthorized and not binding on defendant; and that plaintiffs were contributorily negligent and had assumed the risk, if any, attendant upon the location of the heater.

The building in which the fire occurred was a one-story structure with masonry walls and roof of part wooden construction supported on steel beams. It was originally constructed as a supermarket and had been extensively remodeled in 1945 to house an appliance firm. Subsequently it was leased to Bennett, Inc., who used the premises for sale and repair of mechanical lawn and gardening equipment. It is conceded that defendant did not install heater No. 1 in the first instance, nor did it reinstall it in 1945, nor have anything to do with its location. Defendant's work was restricted to lighting the burner and cleaning and repairing the mechanism.

Unit heater No. 1, like the other heaters, was comprised of a fire box enclosing a gas burner, a series of heat exchanger tubes which carried the heat to a chamber where a fan drove it off, and a bonnet or hood which collected combustion gases and vented them through a pipe to the outside. The heater was apparently covered by a non-insulated metal casing and was hung from the ceiling of the building by means of two metal pipes. It appears from the evidence that it was located in a loft space above a false ceiling of wooden construction. This space was enclosed on three sides. To the west was an interior partition wall of ordinary construction; to the south was a tile wall extending to the roof; and to the east was the wall of an old freezing room which stopped short of the interior ceiling by some eighteen inches. The heater was suspended with its front connected to twelve inches of metal duct which channeled the blown warm air through a grill in the south tile wall and thence into the sales room.

As stated by the trial court:

"A fire started somewhere in the loft area during the evening of January 13, 1950, when the outside temperature was below zero and strong winds were blowing out of the north. The testimony of Kaufman who discovered the fire is to the effect that when he entered the building from Lake Street he saw only a glow in the area of the vent opening in the tile wall. He went through the archway and hall to a point north of the loft space and looked up in the direction of the loft which he states was generally the area of the fire with considerable smoke and some flame. At the time of his entrance on the scene the telephone and electric lights were inoperative and the large electric clock in the building which was comparatively new and had previously functioned properly was stopped at a time indicated to be some forty minutes prior to his entry on the premises.

"There is of course no direct evidence in the case bearing upon the origin of the fire, and, the precise cause of the fire, if it is to be established, must be established through circumstantial evidence."

After the fire, numerous persons examined the premises and testified as to conditions surrounding the heater at that time. Among these were members of the Minneapolis Fire Prevention Bureau and the Arson Squad. Testimony of these and other witnesses, plus observation of photographs taken at the time, indicates that there was considerable debris in the area, as well as ice and snow. Portions of the roof had burned away, part of the freezer wall adjacent to the heater was devoid of covering, leaving wall studdings exposed, and the heater had fallen so that it rested in a canted position on the false ceiling joists.

On this appeal plaintiffs seek reversal on the grounds that the trial court erred in making certain findings in favor of defendant and in making conclusions of law based on its findings. This court is requested to direct the lower court to enter findings of fact, conclusions of law and order for judgment consistent with plaintiffs' proposed amended findings.

 In order to hold the defendant liable for plaintiffs' damages, the trier of the facts had first to be convinced by a fair preponderance of the evidence that the fire resulted from the cause alleged by the plaintiffs; i. e., that heater No. 1 was located so close to combustible material that the fire ensued. Next, of course, the plaintiffs had to establish that there was negligence on the part of the defendant and that such negligence was a proximate cause of the fire and resulting damages. If the plaintiffs fail on the first point, that is, fail to establish that the fire started by heater No. 1 being too close to combustible material, it is dispositive of the case.

Where, as here, there is no direct evidence as to how the fire actually began, circumstantial evidence must be relied upon. The burden of proof was on the plaintiffs. Whether the fire was started by heater No. 1 being too close to combustible material was an issue of fact. It was determined in favor of the defendant by the court sitting as the trier of the facts. The trial court was not convinced that the fire had started by means of heat radiated from heater No. 1 to adjacent wood or other combustible material. In other words, the court found that the plaintiffs had not sustained the burden of proof. This finding is presumptively correct and will not be disturbed unless clearly erroneous. In Maryland Cas. Co. v. Independent Metal Products Co., 8 Cir., 1953, 203 F.2d 838, 841, we said, in a similar circumstance:

"The basis for the charge of liability is the fact that there was found in this tank a short piece of welding rod which prevented a valve from properly closing, thus permitting the escape of gasoline. The burden of proof was, of course, upon plaintiff and the court found as a fact that it had not sustained the

burden of proving that the piece of welding rod was in the tank at and prior to the time of its delivery to Fruehauf. It is pointed out that for a considerable period of time after its delivery and acceptance by Fruehauf it was out of the possession of defendant and that the finding of the piece of welding rod in the tank at a later date gave rise to no presumption that it had been there at a prior time. This finding of the court is presumptively correct and will not be disturbed unless clearly erroneous and it is not the function of this court to retry and redetermine the facts involved. Pendergrass v. New York Life Ins. Co., 8 Cir., 181 F.2d 136; Graver Tank & Mfg. Co. v. Linde Air Products Co., 336 U.S. 271, 69 S.Ct. 535, 93 L.Ed. 672."

See also Cleo Syrup Corp. v. Coca-Cola Co., 8 Cir., 1943, 139 F.2d 416, 417, 150 A.L.R. 1056; Imperial Assur. Co. of New York v. Joseph Supornick & Son, 8 Cir., 1950, 184 F.2d 930, 933–934; Nee v. Linwood Securities Co., 8 Cir., 1949, 174 F.2d 434, 437. In accordance with the foregoing, our review will be limited to a determination of whether the finding of the trial court was clearly erroneous or induced by an erroneous view of the law.

 We must, of course, view the evidence in a light most favorable to the defendant. Kaiser Motors Corp. v. Savage, 8 Cir., 1956, 229 F.2d 525; Judd v. Wasie, 8 Cir., 1954, 211 F.2d 826.

The record discloses that six witnesses testified regarding the situation as it existed before the fire and five testified concerning the situation after the fire. An expert witness, Dr. Richard C. Jordan, also testified in response to hypothetical questions.

Of those testifying from recollections before the fire, A. A. Bennett, president of Bennett, Inc., stated:

"I would estimate that this heater hung about eight inches to ten inches to that floor. I don't know whether the clearance between the bottom of the heater and the floor was between the floor or the ceiling itself, but something was in the way so it couldn't be opened all the way. If it wasn't the floor, it would either be the top of the 2 by 6's that the floor was laid on, or the ceiling itself I don't know. I estimate that the clearance was eight to ten inches."

Concerning the distance from the heater to the freezer (east) wall, Mr. Bennett said:

"The wall of the freezer was fairly close, it was probably eight or ten or twelve inches away from the east side of the heater."

Fred C. Crisp, the general contractor who remodeled the premises in 1945, testified:

"*These two unit heaters were—they sat in a wooden buck, see, we prepared a wooden buck, prepared a 2 by 4 buck.* It wouldn't be a box, it's a frame fitted in so they can put the metal, screw the metal on that and the louver grill or whatever they should put on it. That was provided for, those frames, in the plans and specifications. The false ceiling that we put in was provided for in the plans and specifications. We put it in the place provided for in the plans and specifications. To the west of this west side of this little hall behind this arched door was another wall which would be the west wall of this little hall. And that was called for by the plans and specifications. The false ceiling covered the entire area between that freezer on the east and that other wall on the west and the east and west wall on the south, and also a short wall, a low wall, on the north.

The north wall did not extend above the false ceiling, the wall between the heater and the rear of the building. There were doors in that north wall; the plan shows two doors. *The rafters rested, we had 2 by 4's, if I recollect, from the south wall to the north wall and they rest-*

*ed on a plate, what we call a plate, that's a 2 by 4 that sits on top of the present wall and these joists extend from the south wall to the north wall in a generally north and south direction.* The flooring of the false ceiling was nailed to those joists underneath. I know there was an air space above the freezer. That air space was open on all three sides, except the outside.

I was there on the ground supervising the work while it was being done, and I was there when the job was completed. I knew where the No. 1 heater was to hang according to the plans and I provided a square there where they could put the grill to deflect the heat out into the front room. I had nothing to do with the place that would take a vent pipe out. It was not a part of my contract. I can't recall the heater in place." (Emphasis supplied.)

Raymond F. Gorrill, a service employee who worked on heater No. 1 at various times, observed that:

"The heater was six to eight inches from the joists underneath", and

"It's pretty hard to recall right now just how much room there was there on the east side of the heater. I don't know if we could walk through it, no.

"There was wood in there, but I don't know just what kind of wood it was, what it was for. Well, there was wood some distance from the east side of the heater. I think I said in this deposition it was between three and four inches, that was just my recollection."

Edward Shaw, another of defendant's service employees, put the bottom of the heater

" * * * about six or seven inches above the false ceiling. * * the heater itself was I would say, yes, between five and six inches from the dimensional lumber."

Concerning the freezer wall, the witness stated:

"The heater was set—oh, I would imagine four or five inches from this wall. I used to get my arm way around that heater and work on the pilots there."

Then Shaw said:

"The area under the heater was all boxed off. This ran up between a couple of joists, up to the level of the heater.

\* \* \* \* \*

"To the left side of the heater, there was wooden framework supporting that heater, right flush up against it so that there was a space between this wooden framework and the wall you have referred to immediately east of it. I would imagine —I would definitely say that this wooden framework was five, six, seven inches away from the heater. There was no wood on the east side of that heater any closer than six or seven inches. \* \* \* I would say that this heater was between four and five inches from the joists below \* \* \*."

The witnesses testifying concerning the situation after the fire and the fire's causation included Thomas Conway, defendant's service superintendent. Mr. Conway said:

"*After the fire* I found wooden framework that was close to the unit heater. It was certainly less than six inches away." (Emphasis supplied.)

"In the condition that I saw it, based upon the report I hold in my hand, it certainly was a heater that was a fire hazard because the fire had already existed, \* \* \*.

"The area that I examined so far as the fire was concerned was the area close to and surrounding unit heater No. 1. The deepest charring that I found in that building *was east of* the heater. It was not right

in the area of the frame work that I referred to. (Emphasis supplied.)

\* \* \* \* \*

"The area to which I refer to, where there was the heaviest burning, was at the south end of the freezer wall or on the north end of the east-west partition. It was anywhere from four to eight feet from the heater."

Wesley P. Page, an investigator working for the Minneapolis Fire Department, testified as to two studdings which he and his colleagues deduced were close to the heater.

"The studdings that I found nailed into the joist were, I estimated, within two inches of the side of the heater to the east \* \* \*.

"The studdings that were burned away according to my estimate were about two inches from the heater *if they were straight up from where they were nailed onto the joists.* \* \* \* They were apparently what was left of an existing partition before the fire. (Emphasis supplied.)

"My opinion is that the wood of this partition or the wood that was within two inches of the heater was ignited by radiated heat from the side of the unit heater.

\* \* \* \* \*

"There is no doubt in my mind that a man who was servicing or working upon this heater would see that studding there.

\* \* \* \* \*

"They had been burned down from above to a rough point. The only purpose I could see that they served was a support from the roof to the joist to support the false ceiling.

\* \* \* \* \*

"The ignition temperature of wood is lowered after continual exposure to extreme heat."

Arthur C. Thompson, arson investigator for the Minneapolis Fire Department, had a similar reaction as to the 2 x 4 studdings. He thought a person

adjusting the heater might not notice the 2 x 4 but would notice it if the heater was taken down. Mr. Thompson testified:

"We examined the area specifically around this heater. We found that the 2 by 4 that was entirely—almost entirely gone, was the nearest one to the side of this heater. *If that had been intact there previous to the fire,* it passed probably within two inches of the side of this heater, but it was burned down to a stud where it was spiked onto the joists. That was the hot spot." (Emphasis supplied.)

"As the result of my investigation, I formed an opinion as to the cause of this particular fire. We decided that this 2 by 4 which had disappeared, burned up, was caused from the heat from this gas heater."

Mr. Thompson testified:

"The stud I referred to, the 2 by 4 apparently below and a little to the east of the heater that was nailed to something, I said *if this went straight up prior to the fire, it would be in my opinion about 2 inches, possibly a little less, from the side of the heater.* And I said that *this is the 2 by 4 which, if it had gone straight up before this fire,* is the piece of wood that in my opinion ignited and caused this fire." (Emphasis supplied.)

Robert Geraghty, gas heating inspector for the City of Minneapolis, put the accused studding, if in place, at "about three inches from the heater". He went on to relate that:

"After the fire the heater was in approximately its normal installed position, I would say."

Arthur Bauman, Chief of the Minneapolis Fire Prevention Bureau, determined that the fire started in the loft above the false ceiling. He concurred in the finding of Page and Thompson that there was 2 x 4 stubble in the debris which "if that was carried on through up to the roof as a support for that false ceiling, which I think it was, I would say

that (it) * * * would have been approximately two inches or closer from the heater."

Dr. Richard C. Jordan, a professor in engineering, assuming that the evidence of Page and Thompson was valid, stated:

"Assuming the validity of the assumptions, it is my opinion that the fire was caused by ignition of wood in the very near proximity of the heater receiving heat from the unit heater to the wood. The further away the wood is located from the unit heater, the more difficult it would be to ignite the wood. * * "

He went on to testify:

"My conclusion was not necessarily based upon the fact that the question presupposes that there was ordinary wood within a distance of two inches from the east side of the heater. Certainly, six inches is a good limit and in my opinion I would not have wood within six inches of a combustion chamber in a situation such as this. I would want two to three feet for full safety. *If the wood was more than six inches away it is problematical whether this fire would have occurred.* If it was more than six inches away it's much less likely to have occurred. Assuming that the nearest wood on the east was from eight to twelve inches away and the nearest wood on the south was from eight to ten inches away, no wood nearer than that—if the wood material is twelve inches away from the combustion chamber, it would be in my opinion a marginal condition. I say this in all recognition of the fact that it's usually considered to be, within six inches is usually considered to be definitely dangerous and a poor condition of installation. My own testimony is based on the fact that I think that more safety factors should be allowed. Two inches would definitely be dangerous in my opinion. Anything that would increase the intensity of the heat around this heater would be a contributing factor towards the starting of this fire."

The record in this case is voluminous. The above quotations are but samples of the contradictory and unsatisfactory evidence presented at the trial. The court below pointed out that there were other possible causes for the fire— a failure in the electrical system, which had given trouble previously, and a dangerous positioning of the vent pipes complained of by plaintiffs' insurance inspector. These alternative causation theories received little credence from the fire department witnesses but it was the province of the trial court to pass upon the weight to be given the testimony. The court was not bound by the opinion of the expert witnesses. Their testimony was purely advisory. In Solomon v. Renstrom, 8 Cir., 1945, 150 F.2d 805, 808, this court said:

"The credibility of all witnesses, including experts, and the weight to be given their testimony, is to be determined by the trier of facts, and the court is not bound to accept the opinion of experts as more than advisory, even though such testimony may be undisputed."

It was not necessary for the trier of the facts to determine the cause of the fire. He was concerned with whether the plaintiffs had sustained their burden of proving by a fair preponderance of the evidence that the fire started at heater No. 1, and that the fire was a proximate result of negligence on defendant's part. In doing so, he had to weigh the various possibilities as he weighed the testimony out of which the possibilities arose and upon which they rested. This is peculiarly the prerogative of a jury or, as here, the trial court where it sits as trier of the facts. We will examine the possibilities only in accordance with the policy of viewing the evidence in a light most favorable to the prevailing party (here the defendant). We may not concern ourselves with the question of the weight of the evidence (Imperial Assur.

Co. of New York v. Joseph Supornick & Son, 8 Cir., 1950, 184 F.2d 930, 933–934, supra), nor can we substitute our judgment for that of the trial court.

■ As we have said, the burden is on the plaintiffs to persuade the trial court that their theory as to the cause of the fire is correct, and that burden is not satisfied by testimony which tends to show that the negligence of the defendant *may* have caused or even that it probably did cause the fire if it appears that the fire may have resulted from some other cause for which the defendant was not responsible. MacIntosh v. Great Northern R. Co., 1922, 151 Minn. 527, 188 N.W. 551; Solomon v. Brooklyn Cornell Utilities, 1942, 265 App.Div. 886, 38 N.Y.S.2d 218, affirmed 291 N.Y. 593, 50 N.E.2d 1008; Chesapeake & Potomac Telephone Co. v. Noblette, 1938, 175 Md. 87, 199 A. 832; Hendricks v. McCausey, 1941, 299 Mich. 161, 299 N.W. 848; Niswander v. Kansas City Gas Co., Mo.App. 1944, 181 S.W.2d 165.

Plaintiffs insist that the testimony of the experts was sufficient to establish that the fire started by radiated heat to the studding. Their opinions were based on the assumption that the studding went straight up to the roof from the burned stubble. Note Thompson: *"if* that had been intact there previous to the fire", " * * * *if* this went straight up prior to the fire it would be in my opinion about two inches, possibly a little less, from the side of the heater, and I said that this is the 2 by 4 which, *if* it had gone straight up before the fire, is the piece of wood that in my opinion ignited and caused this fire;" and Page: *"if* they were straight up from where they were nailed onto the joists." Geraghty: " * * * *surmising that that wood was in place* at one time I would say * * *"; *"If* the beam or stud that I saw burned down had extended up the side of the heater within a matter of three inches, I would not have permitted its operation." Bauman: "There was, where this was roughed in as they call it, supports for the false ceiling and so

forth, that was burned away, but there was some stubble there showing that there had been *either a joist or a piece of 2 by 4 or whatever it might be.* The Arson Squad and I tried to make a determination as to how close this 2 by 4 was to the heater. We dug around in the debris there and we found stubble of 2 by 4. I would say that *if* that was carried on through up to the roof as a support for that false ceiling, which I think it was, I would say that according to the pictures and to what I can recollect that would have been approximately two inches or closer from the heater. It is my opinion I would say that the cause of the fire is radiant heat, I mean the ignition of wood from heat. And the heat came from the heater, the only thing we could find in this area." (All emphasis supplied.)

The foregoing testimony does not remove the fact question from the realm of doubt. The conclusions of the experts are based on inferences. From the burned down stubble found by the witnesses after the fire it has to be inferred that the 2 x 4's continued straight up so that they would pass within two or three inches of the heater. It necessarily involves an assumption which may not have been true. There was no direct evidence. The trial court found that the showing in this regard was insufficient and certainly an appellate court has no right, on such testimony, to set aside that finding.

■ After the trial in this case, and after the court had entered its findings of fact, conclusions of law and order for judgment, plaintiffs submitted proposed amended and additional findings of fact wherein they suggested findings to the effect that the fire resulted from heat radiated to an "uninsulated combustible wooden framework" located within two or three inches from the heater. From the brief on appeal, it appears that plaintiffs consider the 2 x 4 studdings heretofore mentioned to be the remains of a 2 x 4 buck which the witness Fred Crisp stated the heater sat in rather than a partition or support for the false ceiling

which the fire inspectors thought started the fire. Plaintiffs also point out that the studding might be the "boxed-off duct up to the level of the heater" referred to by the witness Shaw. The trial court considered all testimony, as indicated by his careful and detailed memorandum. On conflicting and contradictory testimony he determined the fact issues against the plaintiffs. From the entire record, we must conclude that the trial court was not clearly erroneous in its statement that:

> "Upon the evidence offered in this case the Court is unable to conclude that the probability is greater that the fire was caused by radiation to wood at the distances present here than that it was the result of the alternatives mentioned."

We are not "left with the definite and firm conviction that a mistake has been committed". United States v. U. S. Gypsum Co., 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746.

The plaintiffs raise other points of alleged error, including violation of city ordinances which require a permit when making repairs costing in excess of $25.00 and use of insulation in installation of a heater where the heater is within six inches of combustible material. Plaintiffs argue that if a permit had been taken out as required, it would have resulted in an inspection by the city which would have disclosed a dangerous condition which would then have been remedied. We agree with the statement of the trial court that:

> "The suggestion that an inspection by city authorities would have resulted in obviating the danger is entirely too remote and conjectural to fasten liability on the defendant."

It is also obvious that without a finding as to the origin of the fire it would be mere speculation and conjecture to hold that a violation of the city ordinance with reference to the use of insulation was a proximate cause. Judgments may not be based on speculation and conjecture. See: Oklahoma Tire & Supply Co. v. Williams, 8 Cir., 1950, 181 F.2d 675; Smock v. Mankato Elks Club, 1938, 203 Minn. 265, 280 N.W. 851; Alling v. Northwestern Bell Telephone Co., 1923, 156 Minn. 60, 194 N.W. 313, 315.

It is unnecessary to comment specifically on each of the remaining alleged errors. They have been sufficiently controverted herein or are of such a nature as to be without prejudice.

Affirmed.